(14)

FILED
NOV 27 2006
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re<br>REGINALD GIBSON, SR.,<br>Debtor. | Case No. 06-24707-A-12L<br>Docket Control No. MHK-1<br>Date: November 27, 2006<br>Time: 1:30 p.m. |

**MEMORANDUM**

The Herzog Company asks the court to terminate the automatic stay on the ground that the debtor, Reginald Gibson, Sr., has commenced a chapter 12 case in bad faith. Three facts allegedly indicate the debtor's bad faith. First, when this petition was filed the debtor was a debtor in a pending chapter 7 case awaiting entry of a discharge. Second, the debtor is not a family farmer and therefore is not eligible for chapter 12 relief. Third, the real property that secures the Herzog Company has little, if any, value above the liens encumbering it.

Alternatively, the Herzog Company asks that the automatic stay be terminated because its interest in its collateral is not adequately protected.

I

The debtor purchased approximately 84 acres of land from the

26

Herzog Company on April 6, 2005 for $200,000. The purchase was financed with a $1 million dollar loan from Capital Finance Corporation and $840,000 in carry-back financing provided by the Herzog Company. These loans are secured by deeds of trust that encumber the 84 acres. The Herzog Company's deed of trust is the junior of the two.

After the purchase, the debtor further encumbered the property. KOA Weaver Estates, L.P., is owed $425,000 secured by a third deed of trust.[1] The evidence presented by the Herzog Company reveals that KOA Weaver Estates, L.P., also holds a fourth deed of trust securing $41,747.43.

The debtor filed a chapter 7 petition on August 3, 2006. According to Schedule I filed in that case, the debtor has no income whatever. This was consistent with the Statement of Current Monthly Income and Means Test Calculation, which indicates that in the six months preceding the filing of the chapter 7 petition the debtor had no income from any source.

Schedule I instructs all debtors to "[d]escribe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document." The debtor responded: "Debtor buys and sells real estate for a living. The last real estate sold was in January 2006."

These admissions jibe with the Herzog Company's assertion that the debtor is a real estate speculator and not a farmer.

---

[1] This is based on the debtor's admissions in schedules that were signed under penalty of perjury filed on September 7, 2006 in a chapter 7 case, Case No. 06-22927. The court takes judicial notice of them. No schedules have yet been filed in this chapter 12 case.

The Statement of Financial Affairs filed in the chapter 7 case indicates that the debtor had no employment income in 2004, 2005, or 2006. However, the debtor claimed to have income of $241,802 in 2004 from the sale of real estate, $200,000 in 2005 from "proceeds from leasing land," and $80,000 in 2006 from the sale of real estate.

The reference to lease income in 2005 relates to the 84 acres purchased from the Herzog Company. Apparently, in connection with the purchase, the Herzog Company agreed to lease-back the property. It signed two leases, one for 2005 and one for 2006. The debtor produced the leases for 2005 at the November 22 hearing. But, the debtor admitted that he did not actually receive any rental income in 2005.[2]

The argument and documents filed by the debtor on November 27 also indicate that no rent was actually paid by the Herzog Company under the 2005 lease. Instead, the sale price of the 84 acres was reduced in April 2005[3] by $310,000[4] in exchange for the

---

[2] While no rent has been paid, the debtor asserts that the rent due from the Herzog Company for 2005 (and 2006) remains due and payable. Through its counsel, the Herzog Company agreed that it had not paid rent because none was due. Apparently, the two leases were designed to make it appear that the debtor had sufficient income to repay the loan from Capital Finance Corporation in connection with the debtor's purchase of the property.

[3] Assuming that the Herzog Company in fact reduced the purchase price for the 84 acres, the amount of the credit was set in April 2005, before the grape crop had been grown, harvested, and sold.

[4] At the November 27 hearing, counsel for the debtor admitted that the $200,000 reported in the chapter 7 statement of financial affairs as "proceeds from leasing land" was not actually paid to the debtor. Instead, it represents the credit

Herzog Company's right to farm the land during the remainder of 2005. This means that the consideration paid by the Herzog Company under the 2005 lease did not subject the debtor to any farming risk. He received a credit against the purchase price for the farmland that did not vary depending to the grape yield or the price obtained by the Herzog Company for the grapes.

The court finds that, notwithstanding the statement under penalty of perjury in the Statement of Financial Affairs, the debtor received no rental income from the property in 2005. To the extent the credit against the purchase property can be considered rent, it does not represent, as explained below, income realized by the debtor from a farming operation.

II

In order to be eligible for chapter 12 relief, the debtor must be a family farmer. See 11 U.S.C. § 109(f). Is the debtor a family farmer?

A family farmer is an individual "engaged in a farming operation" from which the individual receives "more than 50 percent of such individual's ... gross income" for the year prior to the filing of the petition, or for the second and third years preceding the filing of the petition. See 11 U.S.C. § 101(18).

A farming operation "includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." See 11 U.S.C. § 101(21). While the

---

against the purchase price and should have been reported at $310,000.

use of the word "includes" indicates that section 101(21) is not meant to be an exhaustive definitional list, to be considered a farmer a debtor must be engaged in an activity that subjects the debtor to the risks traditionally associated with farming. See Armstrong v. Corn Belt Bank (In re Armstrong), 812 F.2d 1024 (7th Cir. 1986) (rental of farmland is not considered a farming operation because the debtor bore none of the traditional risks associated with farming).

Section 101(18) requires that a family farmer be "engaged" in a farming operation. By requiring a debtor to be engaged in a farming operation, Congress limited chapter 12 eligibility to true farmers and excluded speculators and investors who use farm losses to shelter non-farm income.

Section 109(f) limits eligibility for chapter 12 relief to family farmers "with regular income." That is, a farmer otherwise meeting the definition of a family farmer must also have "annual income ... sufficiently stable and regular to enable such family farmer to make payments under a plan...." See 11 U.S.C. § 101(19).

The debtor is not a family farmer.

First, the debtor's admissions in his chapter 7 statements and schedules give no hint that he is a farmer. To the contrary, they make it clear that he buys and sells real estate for a living.

Second, the debtor bought the 84 acres in order to subdivide and sell them. He did not farm the acreage after the purchase. Instead, as part of the purchase, he permitted the Herzog Company to continue to farm the grapes growing on the property.

Third, by renting the acreage back to the Herzog Company the debtor was not engaged in a farming operation. Admittedly, there is a significant split of authority as to whether the rental of farmland is a farming operation. Cf. Armstrong, 812 F.2d 1024 (rental income not farm income) and In re Coulston, 98 B.R. 280 (Bankr. E.D. Mich. 1989) (rent was farm income where farm problems necessitated rental and debtor continued other farm operations). This authority, however, can be reconciled in some degree by noting that in most instances where rental income was considered farm income, the debtor had some operational involvement, either before or after the lease, with the farming operation occurring on the farmland, or the debtor had an ownership interest in the crops grown by the tenant. See Otoe County Nat'l Bank v. Easton (In re Easton), 883 F.2d 630 (Bankr. 8th Cir. 1989).[5]

Here, the debtor was not a farmer prior to the purchase. The lease-back to the Herzog Company was calculated to shift the responsibility for farming to someone else and to avoid the risks attendant to farming while the debtor attempted to resell the property. The debtor's only true interest in the land was its development and sale.

Fourth, the debtor cannot meet the income requirements laid out in section 101(18). That is, 50% of his 2005 income is not

---

[5] In this case, the court is focusing on the debtor's income in 2005 because of the income requirement of section 101(18)(A). The lease produced by the debtor for 2005 gave no indication that he retained an ownership interest in the grapes or the Herzog Company's rental obligation was tied to the income it obtained for the grapes.

attributable to a farming operation. He had no employment income in 2005 and he has admitted in connection with this motion that he received no rental income in 2005 from the Herzog Company. While he claims that it is due, this is disputed by the Herzog Company. Even if the court assumes that it is due to the debtor, that fact remains it has never been paid to the debtor nor has the debtor included the rent receivable as income on his 2005 income tax return.

The debtor has never realized any rental income from the property. Therefore, it cannot possibly comprise 50% of his 2005 gross income.

Fifth, for the same reason the court concludes that the debtor was not engaged in a farming operation, even if he received $200,000 in 2005 rental income, that income is not attributable to the debtor's farming operations.

Finally, whether or not the debtor meets the historical farm income requirement of section 101(18)(A), the debtor does not have regular income to fund a plan as required by section 101(19). Approximately two months before filing his chapter 12 petition the debtor admitted in his chapter 7 case that he had received no income for six months and that he had no employment income in 2004, 2005, and 2006.

At the hearing on November 22, when asked how he intended to reorganize, the debtor did not indicate that he had employment income, or that he intended to farm the acreage. Rather, he stated that he hoped to refinance the acreage. Incurring more debt is not a substitute for regular income.

///

The court finds and concludes that the debtor is not, and was not, a family farmer.

III

If the court nonetheless assumes that the debtor somehow is eligible for chapter 12 relief, the inquiry does not end.

According to the Herzog Company, the acreage is worth $2 million, the same amount for which it sold the property approximately 18 months ago. According to the debtor, it is worth $2.7 million.

The court will assume, for purposes of this motion, that the value is $2.7 million.

The debt encumbering the property totals anywhere from $2 million (according to the debtor) and $2.5 million (according to the Herzog Company).

When the debtor filed his chapter 7 schedules on September 7, 2006, he admitted that debt encumbering the property totaled $2,391,854.48. None of this debt was listed as disputed, contingent, or unliquidated. This total does not include, however, the amounts secured by the fourth deed of trust held by KOA Weaver Estates, L.P., $41,747.43.

For purposes of this motion, the court finds that the property is encumbered by approximately $2,433,602 in secured debt. This amount, comprised of the total debt admitted by the debtor on September 7 plus the additional debt owed to KOA Weaver Estates, L.P., leaves an equity cushion of approximately $270,000.

For several reasons, the court concludes that this 10% equity cushion does not adequately protect the Herzog Company's


interest in the property.

First, the debtor is not making, and has never made, any payments to Capital Finance Corporation or to the Herzog Company. While the secured debt owed to Capital Finance Corporation is not in default, this is because the Herzog Company has been making the payments due it.

Second, the debtor's avowed method of reorganization is to refinance the property. The "letter of interest" produced by the debtor at the November 22 hearing indicated that the lender would charge 7 points plus additional points to pay various brokers who have worked on the transaction. The debtor admits that "several" brokers have worked on his behalf. In addition to paying these points, the debtor will be expected to shoulder the usual and customary fees and costs associated with a real estate loan.

Thus, with existing debt of $2.4 million and points and costs running upward of 10%, it is probable that the value of the property will not support the loan needed by the debtor to clear the debt on the property.

Third, even if a loan could feasibly reorganize the existing debt and pay the transactional costs, the debtor has not established that he would be able to repay a new loan.[6] Just two months before filing this case he reported no income. He still has no income. The debtor's economic situation will not be particularly attractive to a conventional lender.

///

---

[6] Also, in the absence of a new loan, the debtor has no regular income with which to make payments to Capital Finance Corporation and to the Herzog Company.

Of course, there are other lenders and the stiff financial terms indicated in the letter of intent indicate that the debtor is dealing with an unconventional lender. But, even an unconventional lender is likely to want regular interest payments. The debtor has no ability to make any payments. A lender might impound a portion of the loan proceeds in order to fund interest payments. If that occurs, the slim equity cushion becomes an even greater problem. Not only must the existing debt and costs be paid, but the loan proceeds must be used to pay the interest on the loan.

The "letter of interest" indicated that the likely interest rate on a loan given the debtor would be 14%. Simple interest at that rate would total $140,000 annually per $1 million borrowed. So, for instance, in order to repay secured debt of $2.4 million and fees and costs of $270,000, with a two-year loan term, borrowing an additional amount to fund interest payments would require the debtor to borrow approximately $3,417,600.[7] This is considerably more than the property is worth.

It might also be possible for the debtor to refinance only a portion of the existing debt. However, the letter of intent indicated that the lender would require a first deed of trust. This would require the subordination of the existing debt not repaid by the new loan. There is no indication that the holder of any existing debt would agree to a subordination and, give the slim equity cushion, this court is unlikely to prime existing debt. See 11 U.S.C. § 364(d).

---

[7] ($2,400,000 + $270,000 = 2,670,000) * (14% * 2 years = 28%) = $3,417,600.

IV

The court concludes there is cause to terminate the automatic stay. See 11 U.S.C. § 362(d)(1). This chapter 12 case has been filed by an ineligible debtor. This, plus the fact that the chapter 12 petition was filed prior to the debtor's discharge in a pending chapter 7 case,[8] as well as the fact that the debtor has no realistic or plausible ability to reorganize due to the absence of regular income, leads to the inescapable conclusion that this case was filed solely to acquire the automatic stay and not with the intention or ability of reorganizing.

This is bad faith. While the successive filing of chapter 7 and chapter 12 petitions does not constitute bad faith *per se*, it is clear in the context of this most recent case that bad faith is present due to the debtor's lack of eligibility under chapter 12 petition and his likely inability to successfully reorganize. See In re Baker, 736 F.2d 481, 482 (8th Cir. 1984); In re Gayton, 61 B.R. 612, 614 (B.A.P. 9th Cir. 1986).

Further, if the debtor is a family farmer, or if this case were converted to chapter 11, cause still exists to terminate the automatic stay. The slim equity cushion, the debtor's failure to make payments to the senior lienholder and to the Herzog Company,

---

[8] In In re Metz, 820 F.2d 1495 (9th Cir. 1987), the Ninth Circuit held that a debtor may file a chapter 13 after receiving a chapter 7 discharge but before the chapter 7 case is closed. Later courts of this circuit have interpreted Metz to permit the filing of an overlapping second petition as long as the debtor had received a discharge in the pending chapter 7. Metz, 820 F.2d at 1498-99; In re Grimes, 117 B.R. 531, 535 (B.A.P. 9th Cir. 1990).

and the debtor's likely continued inability to make payments and to reorganize indicate that the Herzog's Company' interest in its collateral is not adequately protected.

A separate order will be entered to permit the Herzog Company and its agents to conclude its nonjudicial foreclosure. The 10-day stay of Fed. R. Bankr. P. 4001(a)(3) will be waived.

Dated: 27 Nov. 2006

By the Court

Michael S. McManus, Chief Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities listed at the address shown on the attached list or shown below.

see attached list

DATED: 11/28/06

By: [signature]
Deputy Clerk

EDC 3-070 (New 4/21/00)

David Meegan
1545 River Park Dr #550
Sacramento, CA 95815-4615

Mark Wolff
8861 Williamson Dr #30
Elk Grove, CA 95624-7920

Reginald Gibson
9745 Dynasty Way
Elk Grove, CA 95624

Lawrence Loheit
PO Box 1858
Sacramento, CA 95812-1858

Office of the U.S. Trustee
501 I Street, Room 7-500
Sacramento, CA 95814